J-A24004-25

2025 PA Super 280

| IN RE: W.K. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: PENNSYLVANIA STATE POLICE | : | |
| | : | No. 1068 MDA 2024 |

Appeal from the Order Entered June 20, 2024
In the Court of Common Pleas of York County Civil Division at No(s):
2024-SU-000644

| IN RE: W.K. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: W.K. | : | |
| | : | No. 1088 MDA 2024 |

Appeal from the Order Entered June 20, 2024
In the Court of Common Pleas of York County Civil Division at No(s):
2024-SU-000644

BEFORE:  DUBOW, J., KUNSELMAN, J., and BECK, J.

OPINION BY BECK, J.:                    **FILED DECEMBER 16, 2025**

In these consolidated cross-appeals, W.K. and the Pennsylvania State Police ("PSP") appeal from the order entered by the York County Court of Common Pleas denying W.K.'s petition to expunge the records of his 2004 involuntary commitment (the subject of W.K.'s appeal) and granting his petition to expunge the records of his 2023 involuntary commitment (the

subject of the PSP's appeal).[1]  Upon review, we affirm the trial court's denial of expungement regarding W.K.'s 2004 involuntary commitment and reverse the trial court's grant of expungement with respect to his 2023 involuntary commitment.

This case arises from the two involuntary commitments of W.K. pursuant to section 302 of the Mental Health Procedures Act ("MHPA"),[2] 50 P.S. § 7302, which occurred in June 2004 and May 2023.  On June 16, 2004, police took W.K. to York Hospital after they found him talking to himself in a Wal-Mart.  At the time, W.K. was twenty-one years old and suffering from drug addiction.  At the hospital, Katherine Healen, M.D. examined W.K. and indicated on the physician's examination form in the 302 application that he was severely mentally disabled, diagnosed him with paranoid schizophrenia, and specified that he needed emergency involuntary treatment.  At the time of his 2004 involuntary commitment, W.K. did not receive a copy of the 302 application.  In fact, he did not obtain the application until 2022, when he requested copies of his medical records from York Hospital.  Although W.K.

_____

[1]  This Court sua sponte consolidated these appeals.  *See* Order, 12/19/2024. We subsequently designated W.K.'s appeal at Docket No. 1088 MDA 2024 as the lead appeal, and designated W.K. as Appellant and the PSP as Appellee/Cross-Appellant.  *See* Order, 2/7/2025.

[2]  50 P.S. §§ 7101-7503, Act of Jul. 9, 1976, P.L. 817, as amended.  The General Assembly enacted the MHPA to establish procedures "to assure the availability of adequate treatment to persons who are mentally ill."  50 P.S. § 7102.  Relevant herein, the MHPA governs involuntary emergency examination and treatment, also known as a "302 commitment."  *Id.* § 7302.

received an explanation of his rights at the time of his 2004 involuntary commitment, the 302 application indicated that he did not understand his rights.

On June 17, 2004, York Hospital filed an application for extended involuntary treatment pursuant to section 303 of the MHPA, 50 P.S. § 7303.[3] On June 18, 2004, following a hearing on the 303 application, the mental health review officer determined that although W.K. acted in a paranoid manner while on drugs, there was not clear and convincing evidence that he suffered from severe mental illness that warranted extended involuntary inpatient treatment. **See** Petition to Expunge Record of Involuntary Treatment, 3/5/2024, Exhibit D (Mental Health Review Officer Findings, 6/24/2004). Consequently, the review officer denied the application for extended involuntary treatment under section 303. ***See id.***

On May 15, 2023, York Hospital involuntarily committed W.K. for a second time after W.K. sent numerous disturbing and threatening emails to his pastor, Jeffrey Slemp. In these emails, W.K. also expressed a desire to self-harm. Shortly after W.K.'s arrival at the hospital, Tucker Lurie, M.D., examined him and determined that he required inpatient evaluation and treatment because he exhibited aggressive, disorganized thought processes.

---

[3] "Application for extended involuntary emergency treatment may be made for any person who is being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours." 50 P.S. § 7303(a) (footnote omitted).

On the physician's examination form of the 302 application, Dr. Lurie initially marked the box indicating that W.K. did not need emergency involuntary treatment. Dr. Lurie then corrected the form and crossed out the box indicating that W.K. did not require emergency involuntary treatment and instead checked and initialed the box indicating that W.K. was severely mentally disabled and in need of emergency involuntary treatment for a period not to exceed 120 hours. The following day, Whitney Sherman, M.D., conducted another examination of W.K. and likewise determined that W.K. required inpatient evaluation and treatment because he was having homicidal thoughts. Dr. Sherman also marked the box indicating that W.K. was severely mentally disabled and in need of involuntary treatment and admission to a facility. There is no indication in the record that York Hospital held W.K. in excess of 120 hours.

On March 5, 2024, W.K. filed a petition to expunge the records of his two involuntary commitments. Specifically, he asserted that his 2004 involuntary commitment was improper because he was not mentally ill at the time of the 302 commitment, but rather was suffering from an ongoing drug addiction. Petition to Expunge Record of Involuntary Treatment, 3/5/2024, ¶¶ 32-43. Additionally, W.K. claimed that his 2023 involuntary commitment was improper under 18 Pa.C.S. § 6111.1(g)(2). *Id.* ¶¶ 45-53. He claimed that the 302 application did not contain any allegations or proof that he attempted to inflict serious bodily injury or that he threatened to harm anyone.

*Id.* ¶¶ 50-51. W.K. further asserted that his 2023 involuntary commitment violated the mandates of section 302 of the MHPA, and therefore his due process rights, because Dr. Lurie did not determine that he required emergency involuntary treatment within two hours of his arrival at York Hospital. *Id.* ¶¶ 62-64.

On April 25, 2024, at the hearing on W.K.'s petition to expunge, the trial court admitted the exhibits of W.K., the PSP, and the York County Mental Health-Intellectual & Developmental Disabilities Program ("MH-IDD"), and heard argument from the parties. On June 20, 2024, the trial court denied W.K.'s request to expunge the records of his 2004 involuntary commitment and granted his request to expunge the records of his 2023 involuntary commitment. The court found his petition to expunge the 2004 commitment was barred by the statute of limitations, that the evidence was insufficient to support his 2023 involuntary commitment, and that his 2023 commitment also violated the MHPA and his due process rights. *See* Trial Court Opinion, 10/29/2024, at 4-13.

W.K. timely appealed the denial of his request to expunge his 2004 involuntary commitment and the PSP timely cross-appealed the grant of W.K.'s request to expunge his 2023 involuntary commitment. W.K. presents the following issue for review:

> Whether the [trial court] erred as a matter of law and/or abused its discretion in denying [W.K.]'s petition to expunge records of involuntary treatment with respect to his request to expunge records of [his] June 16, 2004 involuntary commitment as a result

of the statute of limitations where [he] first received records of his 2004 involuntary commitment in 2022 and where the 2004 involuntary commitment noted that [he] did not understand his rights under the provisions of the [MHPA] at the time of his commitment?

W.K.'s Brief at 7 (unnecessary capitalization omitted).  In its cross appeal, the

PSP raises the following issues:

[1.] Did the [trial] court commit an error of law, and/or abuse its discretion, when it ordered the expungement of W.K.'s 2023 involuntary commitment pursuant to 50 P.S. § 7302, when the commitment was based on sufficient evidence?

[2.] Did the [trial] court commit an error of law, and/or abuse its discretion, in ordering expungement pursuant to ***Wolfe v. Beal***, 384 A.2d 1187 (Pa. 1978), when the petition seeking expungement did not properly plead any basis for expungement other than 18 Pa. C.S. § 6111.1(g)(2)?

PSP's Brief at 4.

Our standard of review "in cases involving a motion for expunction is whether the trial court abused its discretion." ***Commonwealth v. Smerconish***, 112 A.3d 1260, 1263 (Pa. Super. 2015).  To the extent that questions exist regarding the sufficiency of the evidence supporting an involuntary commitment, our standard of review is de novo and our scope of review is plenary.  ***In re Vencil***, 152 A.3d 235, 241 (Pa. 2017).

### The 2004 Involuntary Commitment (W.K.'s Appeal)

In the sole issue he raises on appeal, W.K. argues that the trial court erred in determining that his petition for expungement was barred by the statute of limitations.  W.K.'s Brief at 12-15.  He contends that the law at the time of his involuntary commitment provided no statute of limitations for

challenging the sufficiency of the evidence supporting an involuntary commitment and that no such statute of limitations existed until this Court issued its decision in *In re P.M.*, 230 A.3d 454 (Pa. Super. 2020). W.K.'s Brief at 12. Thus, W.K. maintains that because he filed his petition to expunge within six years of that decision, the statute of limitation does not bar his request in this case. *Id.* W.K. further asserts that he did not discover his 2004 involuntary commitment until he obtained the records of that commitment in 2022. *Id.* at 13. W.K. argues that we should reach the merits of his claim and conclude that there was insufficient evidence to support his 2004 involuntary commitment and the records thereof must therefore be expunged. *Id.* at 15-16.

Pennsylvania law prohibits a person who has been subject to an involuntary commitment pursuant to section 302 from possessing, using, controlling, selling, transferring, or manufacturing a firearm. 18 Pa.C.S. § 6105(a), (c)(4). Section 6111.1(g)(2) of the Pennsylvania Crimes Code, however, "provides one avenue to lift the firearm restrictions that result from a 302 commitment." *Vencil*, 152 A.3d at 238. That provision permits a person who was subject to involuntary commitment to petition a court to review the sufficiency of the evidence of that commitment. 18 Pa.C.S. § 6111.1(g)(2).

The trial court denied W.K.'s petition to expunge the records of his 2004 commitment based on its determination that *P.M.* "is binding on this [c]ourt

and requires the application of a [six]-year statute of limitations to the expungement of the records of an involuntary commitment sought under 18 Pa.C.S. § 6111.1(g)(2)." Trial Court Opinion, 10/29/2024, at 3. In *P.M.*, the appellant challenged the trial court's order denying his petition pursuant to section 6111.1(g)(2) for the expungement of the records of his involuntary commitment. *P.M.*, 230 A.3d at 455. P.M. was subject to a 302 commitment in 2005 and did not challenge the commitment in any fashion after his release. *Id.* Instead, in 2018, after he was unable to purchase a firearm because of his involuntary commitment, he filed a petition to expunge in which he asserted that there was insufficient evidence to support his 2005 commitment. *Id.* Like this case, the trial court in *P.M.* denied the petition, concluding that it was barred by a six-year statute of limitations. *Id.* at 456.

On appeal, this Court affirmed the trial court's decision, holding that the six-year statute of limitations for civil actions, as set forth by 42 Pa.C.S. § 5527(b), applied to P.M.'s expungement petition. *P.M.*, 230 A.3d at 456-57. Specifically, section 5527(b) provides that "[a]ny civil action or proceeding which is neither subject to another limitation specified in this subchapter nor excluded from the application of a period of limitation by section 5531 (relating to no limitation) must be commenced within six years." 42 Pa.C.S. § 5527(b). We reasoned that because our Supreme Court in *Vencil* "characterized a [s]ection 6111.1(g)(2) action as a civil matter[,]" the

six-year statute of limitations of section 5527(b) applies to such actions. **P.M.**, 230 A.3d at 457 (citing **Vencil**, 152 A.3d at 246).

Here, W.K. asserts that **P.M.** announced a change in the law by applying a six-year statute of limitations to section 6111.1(g)(2) actions and that the statute of limitations therefore does not bar his petition because he filed it within six years of that decision. W.K.'s Brief at 12. We disagree. **P.M.** did not announce a new rule of law; it applied the existing statute of limitations for civil actions under section 5527(b) to the facts of that case. **See P.M.**, 230 A.3d at 456-57. Accordingly, we conclude that the trial court in this case did not err in determining that W.K.'s petition to expunge the records of his 2004 involuntary commitment was barred by the six-year statute of limitations.

To the extent W.K. argues that the discovery rule acts to preclude the application of the statute of limitations because he only obtained the records related to his 2004 involuntary commitment in 2022, we find the claim unavailing. Recently, our Supreme Court stated the following with respect to the discovery rule:

> [I]n some circumstances, although the right to institute suit may arise, a party may not, despite the exercise of diligence, reasonably discover that he has been injured. In such cases the statute of limitations does not begin to run at the instant the right to institute suit attaches, rather the discovery rule applies. The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct.

*Gidor v. Mangus*, \_\_\_\_ A.3d \_\_\_\_, 2025 WL 2980611, at \*8 (Pa. 2025) (citation omitted).

In refuting W.K.'s argument that the discovery rule applies, the trial court explained:

> We reject W.K.'s argument that the discovery rule should apply here because he had knowledge of his 2004 involuntary commitment in 2004. We do not dispute W.K.'s record which indicates he did not understand his rights at the time of his initial involuntary commitment under section 302 of the [MHPA]. We reject, however, W.K.'s conclusion that he therefore was unable to know of the "injury" he incurred through his involuntary commitment.
>
> To the contrary, W.K. was not only involuntarily committed under section 302, but also underwent a hearing to determine if his commitment should be extended under section 303. Pet., ¶ 13. At that hearing, his mother testified. *Id*[*.*], ¶ 15. W.K. was present for the 303 hearing and was represented by counsel. PSP Trial Ex. 1, pg. 8. The hearing officer's order concludes with the phrase, "Patient is discharged from involuntary, inpatient care and treatment." *Id.* There is no question W.K. either knew of the 2004 commitment in 2004, or through the exercise of reasonable due diligence, should have know[n] of it within the 6 years following his involuntary commitment.

Trial Court Opinion, 10/29/2024, at 4-5.

The record supports the trial court's analysis of the inapplicability of the discovery rule based upon the facts of this case. The record reflects that although W.K. was not aware of his rights while he was subject to a 302 hold in 2004, York Hospital ultimately filed an application for extended involuntary treatment pursuant to section 303 and a hearing was held on the 303 application. Petition to Expunge Record of Involuntary Treatment, 3/5/2024,

- 10 -

¶¶ 13-15, Exhibit D. According to the mental health review officer's findings, the circumstances surrounding W.K.'s 302 commitment were discussed at his 303 hearing and the 303 application indicated that he was cognizant of his rights at that time. *Id.*, Exhibits C, D. Thus, the record reflects that W.K. had notice of his 302 commitment at least at the time of his 303 hearing in 2004. We therefore conclude that the trial court did not err in rejecting W.K.'s argument for the application of the discovery rule.

**The 2023 Involuntary Commitment (PSP's Appeal)**

In its appeal, the PSP challenges the trial court's decision granting W.K.'s petition to expunge his 2023 involuntary commitment. *See* PSP's Brief at 12-22. First, the PSP argues that the trial court abused its discretion in determining that there was insufficient evidence supporting W.K.'s 2023 involuntary commitment. *See id.* at 12-20. Second, it contends that the trial court erred in concluding that W.K.'s 2023 involuntary commitment violated the MHPA and his due process rights. *See id.* at 20-22.

<u>Sufficiency of the Evidence</u>

In support of its claim relating to the sufficiency of the evidence of W.K.'s 2023 involuntary commitment, the PSP asserts that the trial court incorrectly determined that W.K. did not make any threats to Pastor Slemp in the numerous emails W.K. sent to the pastor, as the emails show that W.K. was both making threats of harm to the pastor and threatening self-harm. *Id.* at 13-15. The PSP therefore contends that the evidence was sufficient to support

Dr. Lurie's determination that W.K. was severely mentally disabled and required involuntary inpatient evaluation and treatment. *Id.* The PSP further asserts that the trial court failed to acknowledge that although Dr. Lurie initially checked the box indicating W.K. did not require emergency involuntary treatment, he corrected the form to reflect that he had determined that W.K. did require such treatment. *Id.* at 16-20.

Pennsylvania law provides an avenue for a person subject to an involuntarily commitment pursuant to section 302 of the MHPA to have a court conduct a limited review of the propriety of the commitment:

> A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged.

18 Pa.C.S. § 6111.1(g)(2) (footnote omitted); *see also Vencil*, 152 A.3d at 237 ("The plain language of Section 6111.1(g)(2) requires a court of common pleas to review only the sufficiency of the evidence to support the 302 commitment.").

> [U]nder section 6111.1(g)(2), a challenge to the sufficiency of the evidence to support a 302 commitment presents a pure question of law, and the court's sole concern is whether, based on the findings recorded by the physician and the information he or she relied upon in arriving at those findings, the precise, legislatively-defined prerequisites for a 302 commitment have been satisfied and are supported by a preponderance of the evidence. We emphasize that the trial court's review is limited to the findings recorded by the physician and the information he or she relied upon in arriving at those findings, and requires deference to the

- 12 -

> physician, as the original factfinder, as the physician examined and evaluated the individual in the first instance, was able to observe his or her demeanor, and has particularized training, knowledge and experience regarding whether a 302 commitment is medically necessary.

*In re B.W.*, 250 A.3d 1163, 1167 (Pa. 2021) (citation omitted). We must also review the sufficiency of the evidence to support a 302 commitment in the light most favorable to the physician as the original decision-maker[.]" *Vencil*, 152 A.3d at 237. "Section 6111.1(g)(2) does not … authorize a trial court to 'redecide the case,' operating as a 'substitute' for the physician who originally decided the 302 commitment was medically necessary." *Id.* at 244 (citations and brackets omitted). Thus, "given that we are reviewing a [s]ection 6111.1(g)(2) expungement ruling, we are limited to considering the evidence the physician knew at the time of the 302 commitment." *B.W.*, 250 A.3d at 1170.

Pursuant to section 302 of the MHPA, "[a] person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301(b) and in need of immediate treatment." 50 P.S. § 7302(b). If the examining physician determines "that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately" and may continue for up to "120 hours." *Id.* § 7302(b), (d). An individual is "severely mentally disabled" if "as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and

social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or himself." *Id.* § 7301(a). "[A] clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." *Id.* § 7301(b)(1). "[T]he articulation of a specific plan to harm an identified target that is deemed credible by medical professionals is sufficient to prove an act in furtherance of the threat to commit harm." *B.W.*, 250 A.3d at 1175.

The trial court explained its determination that the evidence was insufficient to support W.K.'s 2023 involuntary commitment as follows:

> At this stage, we are simply reviewing the determination of examining physician, with deference to their conclusion. Here the conclusion Dr. Lurie reached was that W.K. did not require emergency, involuntary treatment. We give deference to that conclusion and believe it is supported by the record. It would be a stretch to find that any statement made in W.K.'s emails was a threat of harm. The most "threatening" statement made by W.K. was that they could just all kill each other. In context, that is not a threat but a response to a perceived threat against W.K. relating to the use of a firearm against him.
>
> Even if the language used by W.K. in his string of emails were to be construed as a whole to be a threat, there is no evidence W.K. committed an act in furtherance of the threat. He did not articulate a plan for harming someone. He did not take any physical action toward fulfilling a threat. He did not appear at Jeff Slemp's house or the church. But most importantly, Dr. Lurie did not find that W.K. had committed an act in furtherance of a threat to commit harm. As we are to defer to Dr. Lurie's findings and those findings are supported by the record, we must reach the same conclusion that Dr. Lurie did, that W.K. did not meet the definition of being a clear and present danger. Thus, W.K. could not be held for involuntary inpatient treatment.

PSP argued Dr. Lurie simply checked the wrong box in error, as demonstrated by his narrative recommendation that the treatment needed was inpatient evaluation and treatment. We reject this argument, as there is a difference between a recommendation that an individual undergo voluntary inpatient treatment and a finding they require emergency, involuntary treatment. Dr. Lurie may have reached the professional opinion that based on W.K.'s emails and his evaluation of W.K. in person, W.K. should undergo inpatient mental health treatment. Frankly, we agree with such a recommendation based upon review of the record. However, meeting the clinical criteria for a recommendation of inpatient treatment does not mean Dr. Lurie concluded the statutory criteria for involuntary commitment were met. Thus, we cannot accept PSP's argument that Dr. Lurie checked the wrong box by mistake.

For these reasons, the 2023 involuntary commitment of W.K. was not supported by sufficient evidence, and therefore must be expunged under the authority of 18 Pa.C.S. § 6111.1(g)(2).

Trial Court Opinion, 10/29/2024, at 8-9.

At the outset, we point out that the trial court's finding that the conclusion "Dr. Lurie reached was that W.K. did not require emergency, involuntary treatment" is not supported by the record. **See id.** at 8. The trial court is correct that Dr. Lurie, who conducted an examination of W.K. within two hours of his arrival at York Hospital, initially checked the box on the physical examination form of the 302 application indicating that W.K. did not require emergency involuntary treatment. **See** MH-IDD Ex. 1, **see also** PSP Exs. (Dr. Lurie's Revised Initial Physical Examination Form). The record further reflects, however, that at the hearing on W.K.'s petition to expunge, MH-IDD and the PSP presented a corrected examination form wherein Dr. Lurie crossed out the box indicating that W.K. did not require emergency

- 15 -

involuntary treatment, checking and initialing the box indicating the doctor found W.K. to be severely mentally disabled and in need of emergency involuntary treatment—in other words, indicating that the box initially checked was a scrivener's error. *See* MH-IDD Ex. 3; *see also* PSP Exs. (Dr. Lurie's Revised Corrected Physical Examination Form). The trial court admitted Dr. Lurie's corrected form into the record, without objection, and this cannot be ignored. *See* N.T., 4/25/2024, at 3-4; *see also **Nernberg & Laffey v. Patterson***, 601 A.2d 1237, 1239 (Pa. Super. 1991) (explaining that an appellate court is required to evaluate all evidence of record). In fact, the parties stipulated to each of MH-IDD's exhibits. *See* N.T., 4/25/2024, at 3-4. The trial court therefore erred in disregarding Dr. Lurie's corrected form. As the record reflects that Dr. Lurie determined that W.K. required emergency involuntary treatment under section 302, we now analyze whether the evidence was sufficient to support W.K.'s 2023 involuntary commitment.

The record reflects that on May 14 and 15, 2023, W.K. sent Pastor Slemp nineteen emails that were rambling, disorganized, and obsessive regarding how W.K. perceived the pastor was treating him. *See* PSP Exs. (W.K.'s Emails). These emails also included several violent and threatening statements, such as, "Word is you should be shot"; "I just don't care anymore. I just want to [sic] people to fucking die"; "I just want you to get shot even more"; "Gun shots [Pastor Slemp]"; "We can all just kill each other"; "I don't

even want to be alive anymore." *See id.* These statements not only threaten harm to Pastor Slemp, but they also threaten self-harm by W.K. *See id.*

We find that the record supports, by a preponderance of the evidence, Dr. Lurie's conclusion that W.K. was severely mentally disabled and in need of involuntary commitment. *See B.W.*, 250 A.3d at 1170. W.K.'s plan was fully formed as it detailed the target of his threats (Pastor Slemp) and the manner of carrying out the threat (expressing a desire to shoot the pastor or see the pastor shot). *See id.*; *see also* PSP Exs. (W.K.'s Emails). W.K. also repeatedly expressed that he wished to die. *See* PSP Exs. (W.K.'s Emails). These plans to harm Pastor Slemp and himself were deemed credible by Dr. Lurie, and thus "sufficient to prove an act in furtherance of the threat to commit harm." *B.W.*, 250 A.3d at 1175; *see also id.* at 1176-77 (holding that the section 301 "requirement that an act in furtherance under the MHPA" need not be overt or tangible).

Here, W.K.'s emails to Pastor Slemp were sufficient to support the conclusion that W.K. presented a clear and present danger to himself and others as he clearly expressed his wish to shoot Pastor Slemp and his own desire to die. We therefore conclude that the trial court abused its discretion in finding the evidence insufficient to support W.K.'s 2023 involuntary commitment.

<u>MHPA and Due Process Violations</u>

The PSP further argues that the trial court erred in granting W.K.'s petition to expunge his 2023 involuntary commitment based on the court's determination that York Hospital violated the MHPA and W.K.'s due process rights. *See* PSP's Brief at 20-22. The trial court reached this determination based upon the hospital's failure to release W.K. after Dr. Lurie determined he did not require emergency involuntary inpatient treatment and after the hospital held him for additional time following Dr. Sherman's examination, which she performed outside the mandated two-hour timeframe of section 302(a). Trial Court Opinion, 10/29/2024, at 13. In support of its decision, the trial court relies on *Wolfe v. Beal*, 384 A.2d 1187 (Pa. 1978), and *In re A.J.N.*, 144 A.3d 130 (Pa. Super. 2016). *See* Trial Court Opinion, 10/29/2024, at 9-12.

In *Wolfe*, the appellant was subject to involuntary commitment under the then-applicable Mental Health and Intellectual Disability Act of 1966.[4] *Wolfe*, 384 A.2d at 1188. After her release, Wolfe petitioned the trial court for a declaration that her commitment was "null and void" on the basis that it violated her due process rights. *Id.* at 1188. She requested an order expunging the records of the proceedings and the destruction of any records of her commitment. *Id.* Although the trial court determined that Wolfe's

---

[4] 50 P.S. § 4405, Act of October 20, 1966, Special Sess. No. 3, P.L. 96, art. IV, § 405. Section 502 of the MHPA repealed this provision "except insofar as it relates to mental retardation or to persons wo are mentally retarded." *Id.*, Editors' Notes.

commitment violated her due process rights and that she was entitled to expungement of all court records related to her commitment on that basis, the court declined to order the destruction of the hospital records relating to her commitment. *Id.* at 1188-89.

On appeal, our Supreme Court held that "a person who has been unlawfully committed to a state mental hospital has a right to the destruction of the hospital records which were created as a result of the illegal commitment." *Id.* at 1189. The Court therefore ordered the hospital to destroy all records of Wolfe's commitment. *Id.*

Subsequently, in *A.J.N.*, the appellant sought expungement of his two involuntary commitments under section 6111.1(g)(2) and, in the alternative, he "asserted that the commitments in question failed to comply with the requirements of [section 302(a) of the MHPA,]" and his commitments thus constituted "a violation of his right to due process of law." *A.J.N.*, 144 A.3d at 133. For both commitments, police had taken A.J.N. to a mental health facility prior to the county administrator issuing a warrant permitting them to do so and without a physician having personally observed conduct by A.J.N. demonstrating the need for a mental health examination. *Id.* at 136.

The trial court denied A.J.N.'s request to expunge the records of his involuntary commitment. *Id.* at 134. On appeal, this Court reversed, concluding that A.J.N.'s commitments did not follow the mandates of the MHPA, violating his due process rights. *Id.* at 139. We explained that

although the government has inherent police powers to involuntarily commit persons who are a danger to themselves or others, the individual subject to commitment also has "a countervailing liberty interest protected by the due process clause of the Constitution." *Id.* at 137. "The MHPA is an enlightened legislative endeavor to strike a balance between the state's valid interest in imposing and providing mental health treatment and the individual patient's rights." *Id.* (quotation marks and citation omitted). "The MHPA specifically embodies these principles by stating that its provisions must be interpreted in conformity with the principles of due process[.]" *Id.* (quoting 50 P.S. § 7102). Thus, we explained that "[t]he legislative policy reflected in the [MHPA] is to require that strict conditions be satisfied before a court order for commitment shall be issued. Such a policy is in accord with the recognition that commitment entails a massive deprivation of liberty." *Id.* at 137.

Citing **Wolfe**, we observed that "[e]ven before enactment of the MHPA, our case law provided that, if a person is involuntarily committed in violation of his due process rights, he is entitled to expungement of the proceedings and the destruction of all records relating thereto." *Id.* (citing **Wolfe**, 384 A.2d at 1188-89). We therefore held that "the case law uniformly mandates expungement and destruction of records when the procedural, due process requirements of the MHPA are violated during a commitment proceeding." *Id.* at 139; **but see In re V.A.H.**, 286 A.3d 1311, 1315 (Pa. Super. 2022) (holding that Article I, Section 1 of the Pennsylvania Constitution "does not

- 20 -

create an independent cause of action by which an individual can seek to expunge involuntary commitments authorized under [s]ection 302 of the MHPA").[5]

In this case, W.K. pled in his petition to expunge that his 2023 involuntary commitment violated the mandates of section 302 of the MHPA, and therefore his due process rights, because Dr. Lurie did not determine that he was in need of emergency involuntary treatment within two hours of his arrival at York Hospital. Petition to Expunge Record of Involuntary Treatment, 3/5/2024, ¶¶ 62-64. The trial court agreed, concluding that W.K.'s 2023 involuntary commitment violated the MHPA and thus, his due process rights, for the following reasons:

> W.K. arrived at York Hospital at 2:17 p.m. He was examined by Dr. Lurie at 2:53 p.m. There was less than a 2-hour time lapse between when he arrived and when he was examined by Dr. Lurie. The [MHPA] states, "[a] person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely mentally disabled within the meaning of section 301(b) and in need of immediate treatment." 50 [P.S.] § 7302(b). Thus, this initial examination did not run afoul of the statutory requirements. However, the results of this

---

[5] Article I, Section 1 of the Pennsylvania Constitution provides as follows:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Pa. Const. Art. I, § 1. We note that in **V.A.H.**, this Court determined that the appellant had waived any Article I, Section 1 claims by failing to plead them in the expungement petition. **V.A.H.**, 286 A.3d at 1316.

examination by Dr. Lurie resulted in a finding that W.K. was not in need of immediate treatment. According to the same provision of the statute, this finding required that W.K. "shall be discharged and returned to such place as he may reasonably direct." ***Id.*** He was not discharged, but was held until 2:54 a.m. the next day and more than 12 hours after his arrival. Because he was not discharged as required after Dr. Lurie's initial determination, the involuntary commitment was illegal and must be expunged.

Trial Court Opinion, 10/29/2024, at 11-12.

The trial court's conclusion rests entirely on its finding that Dr. Lurie, following his initial evaluation of W.K., checked the box on the physical examination form of the 302 application indicating that W.K. did not require emergency involuntary treatment. ***See id.***; ***see also*** MH-IDD Ex. 1; PSP's Exs. As stated above, the trial court disregarded the evidence, admitted without objection, that MH-IDD and the PSP presented at the hearing on W.K.'s petition to expunge revealing that Dr. Lurie had corrected his examination form, crossing out the box indicating that W.K. did not require emergency involuntary treatment and checking and initialing the box indicating the doctor found W.K. to be severely mentally disabled and in need of emergency involuntary treatment "for a period not to exceed 120 hours." ***See*** MH-IDD Ex. 3; ***see also*** PSP's Exs. The trial court largely ignores this evidence and simply opted to disbelieve that Dr. Lurie corrected the form. ***See*** Trial Court Opinion, 10/29/2024, at 12. As the sole basis for the trial court's conclusion that W.K.'s 2023 involuntary commitment violated the MHPA was based on Dr. Lurie's scrivener's error on the original form that the record unequivocally reveals he later corrected, we conclude that the trial

court erred in determining that W.K.'s 2023 commitment violated his due process rights.

## Conclusion

Accordingly, based on the foregoing, we affirm the trial court's order to the extent that it denied expungement of W.K.'s 2004 involuntary commitment and reverse the order to the extent that it granted expungement of his 2023 involuntary commitment.

Order affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/16/2025